IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL ACTION NO. |
| | ) | 2:10cr186-MHT |
| MILTON E. McGREGOR, | ) | (WO) |
| THOMAS E. COKER, | ) | |
| LARRY P. MEANS, | ) | |
| JAMES E. PREUITT, | ) | |
| HARRI ANNE H. SMITH, | ) | |
| JARRELL W. WALKER, JR., | ) | |
| and JOSEPH R. CROSBY | ) | |

### OPINION

Defendants Milton E. McGregor, Thomas E. Coker,
Robert B. Geddie, Jr., Larry P. Means, James E. Preuitt,
Quinton T. Ross, Jr., Harri Anne H. Smith, Jarrell W.
Walker, Jr., and Joseph R. Crosby were charged in a 39-
count indictment, which included charges of federal
programs bribery, extortion, honest services mail and
wire fraud, money laundering, making a false statement,
obstruction of justice, and conspiracy to commit federal
programs bribery.

At the conclusion of the evidence, and as required by
law, <u>United States v. Hewes</u>, 729 F.2d 1302, 1312 (11th

Cir. 1984), the court made oral findings, with the promise that a written opinion would follow, that the government had shown by a preponderance of the evidence all of the requisites for the admissibility of the co-conspirator statements about which evidence has been received against each defendant except Crosby.

In the meantime, a jury found Geddie and Ross not guilty on all counts and found McGregor, Coker, Means, Preuitt, Smith, Walker, and Crosby not guilty on some counts and was unable to reach a verdict on the remaining counts; however, the admissibility of co-conspirator statements is still an issue for the retrial of the seven defendants. Therefore, for purposes of the retrial of the seven defendants, this written opinion memorializes the court's oral findings, and further sets forth the reasons for the court's conclusion that the government has proven, except as to Crosby, the requisites for the admissibility of these statements by a preponderance of the evidence.

2

### I.

The existence of a conspiracy and the defendant's participation in it are preliminary questions of fact that must be resolved by the court pursuant to Fed. R. Evid. 104(a) before a co-conspirator statement may be admitted into evidence. <u>Bourjaily v. United States</u>, 483 U.S. 171, 175 (1987). The court must apply a preponderance-of-the-evidence standard in determining whether such preliminary questions of fact have been established under Rule 104(a). <u>See</u> <u>id</u>. at 176. The court has discretion to require the government to establish the elements of admissibility prior to receiving co-conspirator statements, or, alternatively, to admit the out-of-court statements on the condition that the government subsequently produce independent evidence of the conspiracy. <u>See</u> <u>United States v. Miller</u>, 664 F.2d 826, 827-28 (11th Cir. 1981).

3

In this case, the court, in its discretion, admitted the out-of-court statements of co-conspirators before all evidence of the conspiracy had been received.  Three elements must be met for a co-conspirator's statement to be admissible against a defendant.  The court must find that (1) a conspiracy existed; (2) the co-conspirator and the defendant against whom the statement was offered were members of that conspiracy; and (3) the statement was made during the course of and in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E); Hewes, 729 F.2d at 1312.

Because the court's findings of fact are based not on the beyond-a-reasonable-doubt standard but rather on the less-demanding preponderance-of-the-evidence standard, this opinion should not be construed as finding that any defendant is guilty beyond a reasonable doubt, nor should the opinion be viewed as even as advocating such.  That determination is within the province of the jury and is not for the court to decide.  Indeed, if the applicable

4

standard here were beyond a reasonable doubt, the court might very well reach contrary findings regarding these defendants' participation in the alleged conspiracy.

## II.

The government alleges that the defendants participated in a sweeping conspiracy to buy and sell votes of Alabama lawmakers.  The ultimate objective was to ensure passage of Senate Bill 380 ("SB380"), which would have authorized a constitutional referendum on whether to legalize electronic bingo.  The conspirators cooperated to offer or accept campaign contributions and other things of value in exchange for official acts and votes in favor of SB380.

SB380 was introduced in the Alabama Senate on February 4, 2010.  On March 3, an initial procedural vote, known as a budget isolation resolution ("BIR"), failed to receive sufficient votes to pass the Senate. On March 30, a revised version of SB380 received the

minimum number of votes required to pass proposed referenda to the Alabama Constitution. After the federal investigation into allegations of bribery became known, the House of Representatives declined to vote on SB380.

The indictment charges that a coalition of gambling facility operators, lobbyists, lawmakers, and legislative staff conspired to offer and accept bribes in advance of the votes on SB380. McGregor and Ronnie Gilley were owners of prominent gaming establishments in Alabama during 2010. McGregor operated the VictoryLand casino and racetrack in Macon County. Gilley managed the Country Crossing facility in Houston County and was assisted by Walker, a spokesperson for the establishment. To promote the passage of SB380, they worked in conjunction with several lobbyists, including Coker, Geddie, Jarrod Massey, and Jennifer Pouncy. Gilley, Massey, and Pouncy have each pled guilty to offenses including conspiracy to commit federal programs bribery.

Means, Preuitt, Ross, and Smith were the lawmakers charged in the scheme. Each was a senator in the Alabama legislature in 2010. The lawmakers communicated extensively with McGregor, Gilley or their lobbyists in advance of the vote on SB380. McGregor also worked with Crosby, an analyst with the Legislative Reference Service, and made $ 3,000 monthly payments to him.

The United States conducted in-person electronic surveillance of the defendants with the assistance of three lawmakers: Senator Scott Beason, Senator Benjamin Lewis, and Representative Barry Mask. These legislators agreed to wear recording devices in an effort to obtain direct evidence of bribery. The defendants' phone lines were also tapped. In this manner, the government acquired thousands of recordings of the defendants' conversations.

At trial the government sought to bolster Beason's, Lewis's, and Mask's credibility for cooperating with the investigation. For instance, Beason testified that he

7

approached the F.B.I. only after receiving what he perceived as veiled threats that McGregor and Gilley would try to embarrass him politically if he refused to accept bribes. According to Beason, he agreed to cooperate with the F.B.I. to "do whatever I could to help get the bad guys." Trial Transcript, Doc. No. 1281, at 86. By "bad guys," Beason meant: "The gambling interests. Ronnie Gilley, Milton McGregor and whoever might be working with them." <u>Id</u>. Beason testified: "[I]f they're willing to make those sorts of threats, and at the same time they were talking about how much money they could spend in your district and what they would do to make you look bad in your district. I thought, if they're going to do that to me, what are they going to do to somebody who ... may have had an affair or something like that? My feeling was, if they're going to say those things to me when I don't think I've done anything, what would they say to somebody who may have done something?" <u>Id</u>. at 87-88.

As a preliminary matter, the court finds that Beason and Lewis lack the credibility that the government sought to establish. The evidence introduced at trial contradicts the self-serving portrait of Beason and Lewis as untouchable opponents of corruption. In reality, Beason and Lewis had ulterior motives rooted in naked political ambition and pure racial bias.

The court finds that Beason and Lewis lack credibility for two reasons. First, their motive for cooperating with F.B.I. investigators was not to clean up corruption but to increase Republican political fortunes by reducing African-American voter turnout. Second, they lack credibility because the record establishes their purposeful, racist intent.

Beason, Lewis, and their political allies sought to defeat SB380 partly because they believed the absence of the referendum on the ballot would lower African-American voter turnout during the 2010 elections. One of the government's recordings captured Beason and Lewis

9

discussing political strategy with other influential Republican legislative allies.[1]  A confederate warned: "Just keep in mind if [a pro-gambling] bill passes and we have a referendum in November, every black in this state will be bused to the polls.  And that ain't gonna help." Trial Transcript, Doc. No. 1298, at 80.  The participants predicted: "Every black, every illiterate" would be "bused on HUD financed buses."  Id.  Beason agreed: "That's right.  This will be busing extra. . . . Because you gotta have somebody to pay for those buses." Id. at 81.  One participant replied that casinos would provide "free food" and gambling certificates to get black voters to the polls. Id.

In a separate conversation, during which Lewis asked whether the predominantly black residents of Greene County were "y'all's Indians?," id. at 86, Beason

---

1.   It is unclear why Beason recorded the discussion with his political allies.  The government acknowledges that it was an inadvertent recording.  Beason may have simply forgotten he was wearing a wire after recording numerous conversations with other lawmakers.

responded by derisively referring to blacks as
"Aborigines." Id. at 87.[2]

The court finds that Beason and Lewis cooperated with
the F.B.I. in order to secure political advantage. The
evidence at trial showed that black communities in
Alabama tend to support electronic bingo. The evidence
further demonstrated that black voters tend to be
Democrats. See Trial Transcript, Doc. No. 1298, at 75-
90; ex. J-504 & J-505.[3]  Indeed, Beason's and Lewis's
scheme was predicated on their belief that blacks
supported electronic bingo and Democratic candidates.

_____

2.   While this remark is primarily targeted at
African-Americans, the court notes that it also evidences
Beason's racist animus toward Native Americans.   The
history of oppression against Native Americans continues
today, particularly in the American West. See, e.g.,
Pamela S. Karlan, Lightning in the Hand: Indians and
Voting Rights, 120 Yale L.J. 1420 (2011).

3.   This evidence accords with congressional findings
and court decisions. See, e.g., H.R. Rep. No. 109-478, at
34-35 (2006) (discussing racially polarized voting in the
South); Dillard v. Baldwin County Board of Education, 686
F. Supp. 1459 (M.D. Ala. 1988) (Thompson, J.) (finding
racially polarized voting in Baldwin County).

In an environment characterized by racially polarized voting, politicians can predictably manipulate elections--either by drawing districts or setting an issue for a referendum--to "minimize or cancel out [minority voters'] ability to elect their preferred candidates." Thornburg v. Gingles, 478 U.S. 30, 48 (1986). By preventing SB380 from appearing on the 2010 ballot, Beason and Lewis believed that black voters would stay home on election day, thereby increasing Republican chances to take control of the state legislature. The evidence indicates that Beason and Lewis sought to inculpate the defendants primarily to neutralize a potential political threat. Beason's and Lewis's political objective undercuts the anti-corruption motive they advanced at trial.

The racially discriminatory purpose expressed in the recordings further undermines Beason's and Lewis's credibility. It is, perhaps, unsurprising that politicians have political motives to disrupt and defeat

12

legislation advanced by opponents.  But Beason, Lewis, and other influential Republican politicians did not target Democrats generally in their opposition to SB380; they plainly singled out African-Americans for mockery and racist abuse.  Cf. LULAC v. Clements, 999 F.2d 831, 854 (5th Cir. 1993) (en banc) (commenting that § 2 of the Voting Rights Act, 42 U.S.C. § 1973, "is implicated only where Democrats lose because they are black, not where blacks lose because they are Democrats").

Beason's and Lewis's statements demonstrate a deep-seated racial animus and a desire to suppress black votes by manipulating what issues appeared on the 2010 ballot. Lawmakers who harbor such sentiments lack the integrity expected from elected officials.

The intersection of political strategy and purposeful racial prejudice is nothing new.  Alabama has a lengthy and infamous history of racial discrimination in voting. See, e.g., City of Pleasant Grove v. United States, 479 U.S. 462 (1987); Hunter v. Underwood, 471 U.S. 222

13

(1985); <u>Gomillion v. Lightfoot</u>, 364 U.S. 339 (1960); <u>Harris v. Siegelman</u>, 695 F. Supp. 517 (M.D. Ala. 1988) (Thompson, J.); <u>Dillard v. Crenshaw County</u>, 640 F. Supp. 1347 (M.D. Ala. 1986) (Thompson, J.); <u>Buskey v. Oliver</u>, 565 F. Supp. 1473 (M.D. Ala. 1983) (Thompson, J.); <u>United States v. Alabama</u>, 252 F. Supp. 95 (M.D. Ala. 1966) (Rives, J.); <u>Sims v. Baggett</u>, 247 F. Supp. 96 (M.D. Ala. 1965) (per curiam); <u>United States v. Parker</u>, 236 F. Supp. 511 (M.D. Ala. 1964) (Johnson, J.); <u>United States v. Penton</u>, 212 F. Supp. 193 (M.D. Ala. 1962) (Johnson, J.); <u>Section 5 Objections</u>, U.S. Dep't of Justice, <u>http://www.justice.gov/crt/about/vot/sec 5/al obj2.php</u> (last visited Oct. 14, 2011) (listing all objection imposed against Alabama under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, including 24 from 1990 to present). In light of this history, the court cannot disregard clear evidence of political manipulation motivated by racism.

14

To some extent, "[t]hings have changed in the South."
Northwest Austin Mun. Util. Dist. No. One v. Holder, 129
S. Ct. 2504, 2514 (2009). Certain things, however,
remain stubbornly the same. In an era when the "degree
of racially polarized voting in the South is increasing,
not decreasing," Alabama remains vulnerable to
politicians setting an agenda that exploits racial
differences. H.R. Rep. No. 109-478, at 34 (2006)
(internal quotation marks omitted). The Beason and Lewis
recordings represent compelling evidence that political
exclusion through racism remains a real and enduring
problem in this State. Today, while racist sentiments
may have been relegated to private discourse rather than
on the floor of the state legislature, see Busbee v.
Smith, 549 F. Supp. 494, 500 (D.D.C. 1982) (Edwards, J.)
(labeling a state lawmaker a "racist" for using racial
slurs to refer to majority-minority districts), it is

still clear that such sentiments remain regrettably entrenched in the high echelons of state government.[4]

The government has repeatedly argued that the issue of racism is irrelevant to the crimes alleged in the indictment.[5] But the court cannot consider this evidence a mere distraction. As the court has explained, the issues of motive and bias are directly relevant to evaluating the credibility of the government's cooperating witnesses.

Furthermore, Beason's and Lewis's wrongful motivations are relevant to the political corruption at the heart of this trial. As detailed below, the government has proven the existence of an illegal vote-buying conspiracy by a preponderance of the evidence.

_____

4. The court notes that this evidence exists only because Beason voluntarily wore surreptitious recording devices. Such undisputable evidence of intentional racial discrimination is rarely available.

5. The government also contends that Beason and Lewis did not make all of the racist commentary in the recording. They were simply present during the discussions. This argument is unpersuasive given Beason's and Lewis's own statements.

16

The government rightly seeks to prosecute illicit bribery in the guise of campaign contributions.  Campaign support explicitly conditioned on a specific vote or other official action distorts the political process by placing lawmakers into the pockets of the most generous donors. Tolerating such bribery schemes leaves the public with no assurance that its elected officials will consider the general merits of legislation, rather than its impact on the wealthiest donors.

At the same time, the discriminatory intent expressed by Beason, Lewis, and their influential legislative friends represents another form of corruption infecting the political system.  Like the defendants, Beason's and Lewis's opposition to the bill was not grounded in impartial evaluation of the merits of SB380.  Rather, they were motivated by a fear of who might turn out to vote.  The purpose of their competing scheme was to maintain and strengthen white control of the political system.  It is intolerable in our society for lawmakers

to use public office as a tool for racial exclusion and
polarization.   This form of race discrimination is as
profoundly damaging to the fabric of democracy as is the
bribery schemes the government seeks to punish.

To be absolutely clear, there is no indication
whatsoever that the prosecutors in this case condoned or
shared any of the biases of their cooperating witnesses.
But eliminating bribery will treat only one symptom of
political corruption in this State.   To cure the larger
disease, it is essential to address with equal force the
politics of racial prejudice and exclusion.

In spite of Beason's and Lewis's lack of credibility,
the court finds the government's evidence sufficient to
prove by a preponderance of the evidence that an illegal
conspiracy existed for the admissibility of the co-
conspirator statements against each defendant.   Beason's
and Lewis's testimony is corroborated by tape recordings
and accounts of other witnesses who did not share the
same discriminatory motivations.   Just as the racist

18

statements of the government's witnesses speak for themselves, much of the evidence against the defendants stands on its own.


### III.

"[A]greement is the essential evil at which the crime of conspiracy is directed." United States v. Chandler, 388 F.3d 796, 806 (11th Cir. 2004) (citing Iannelli v. United States, 420 U.S. 770, 777 n.10 (1975)). The government must prove that the defendants reached an affirmative agreement to engage in a criminal enterprise. Although the existence of an agreement is essential to the crime of conspiracy, the agreement may be, and often must be, proven through circumstantial evidence. "The existence of a conspiratorial agreement may be established through either direct or circumstantial evidence, such as inferences from the conduct of the alleged participants." United States v. Farris, 77 F.3d 391, 394 (11th Cir. 1996). "[T]here is rarely any direct

19

evidence of any agreement to join a conspiracy, and thus,
the defendant's assent can be inferred from acts that
furthered the conspiracy's purpose." <u>United States v.
Miller</u>, 693 F.2d 1051, 1053 (11th Cir. 1982).   The
agreement may be either formal or informal. <u>See</u> <u>United
States v. Wieschenberg</u>, 604 F.2d 326, 335 (5th
Cir. 1979).[6]

The government has satisfied the preponderance-of-
the-evidence standard by producing direct and
circumstantial evidence that the defendants collaborated
extensively to ensure the passage of SB380 in the Alabama
Senate.   Much of this evidence corresponds with legal
lobbying activity.   It is plainly legal to advocate for
the passage of legislation.   It is also legal to
contribute to a lawmaker's political campaign.   To some
extent, the evidence that the defendants combined to

_____

6. In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206,
1209 (11th Cir. 1981) (en banc), the Eleventh Circuit
adopted as binding precedent all of the decisions of the
former Fifth Circuit handed down prior to the close of
business on September 30, 1981.

support pro-gambling legislation overlaps with circumstantial evidence suggesting that they conspired to offer and accept bribes. Evidence of the former is consistent with a legal agreement, whereas evidence of the latter is not. "If persons pursuing a lawful end are to be prosecuted as conspirators, the government must show that they agreed to use criminal means to pursue that end, for it is fundamental to the law of conspiracy that the government show an agreement between two or more persons to commit a <u>crime</u>." <u>United States v. Fernandez</u>, 892 F.2d 976, 987 (11th Cir. 1989) (emphasis in original).

In this case, the analysis is further complicated by the fact that the law governing bribes in the form of campaign contributions is not entirely settled. "Since a campaign donation--unlike bags of cash delivered to the official himself--is protected First Amendment activity and, indeed, the normal course of politics in this country, due process requires that the potential campaign

21

donor have notice of what sort of conduct is prohibited."
United States v. Siegelman, 640 F.3d 1159, 1174 n.21
(11th Cir. 2011).

Nevertheless, it is clear that the First Amendment
does not protect bribes masquerading as campaign
contributions.  "[L]arge direct contributions ... given
'to secure a political quid pro quo,' ... [are] covered
by bribery laws if a quid pro quo arrangement [is]
proved."  Citizens United v. FEC, 130 S. Ct. 876, 908
(2010) (quoting Buckley v. Valeo, 424 U.S. 1, 26 (1976))
(internal citations omitted).  It is a criminal offense
to explicitly solicit, offer, or agree to exchange
campaign contributions for a specific vote or other
official action.  See McCormick v. United States, 500
U.S. 257, 273 (1991); Siegelman, 640 F.3d at 1172.
Whether ambiguity persists over the precise definition of
an illegal quid pro quo in the context of campaign
contributions, the court finds that the defendants in
this case had notice that their conduct was illegal.

IV.

Once again, the court emphasizes that the following discussion only goes to the government's evidentiary burden under Federal Rules of Evidence 104(a) and 801(d)(2)(E).  While the court finds by a preponderance of the evidence that a conspiracy existed, this says nothing about whether the government has satisfied the much higher burden of proving the defendants' guilt beyond a reasonable doubt.  That is the jury's province.

A.  McGregor

The government has demonstrated by a preponderance of the evidence that McGregor led the conspiracy in conjunction with Ronnie Gilley to offer bribes to lawmakers in exchange for their vote on SB380.  McGregor had an enormous financial motive to pass SB380; he had been forced to shut down the VictoryLand casino in the wake of raids on gambling venues by former Governor Bob Riley.  The closure of VictoryLand translated into a

23

multi-million dollar loss to McGregor in personal and business income.

As a step in the pathway to legalization of electronic bingo, SB380 could have helped McGregor recoup some of the financial damage. Indeed, McGregor referred to SB380 as a "survival bill." Ex. J-140, page 9, line 6. McGregor's financial motive, though not sufficient to support his participation in the conspiracy, provides context for other evidence regarding his involvement.

Gilley, the former operator of the Country Crossing casino, testified that he collaborated with McGregor to offer illicit campaign contributions to lawmakers for their commitment to vote for SB380. In 2009, McGregor secured a substantial interest in Gilley's Country Crossing establishment. McGregor provided a $ 5 million loan that, according to Gilley, was intended in part "to pass legislation and basically take whatever means necessary to pass legislation." Trial Transcript, Doc. No. 1334, at 95.

24

The evidence indicates that McGregor was aware that Gilley was offering funds from his loan to lawmakers in the form of illicit bribes.  Gilley testified that he reached out to Beason for his vote on SB380 "because Mr. McGregor asked me to."  Id. at 187.  When Gilley told McGregor "it was going to take $500,000 to get [Beason's] vote," id. at 144, McGregor ratified the decision to offer the contributions in exchange for Beason's vote. When Gilley could not cover the costs of Beason's requested contributions, he asked McGregor if the money could come out of McGregor's financial interest in Country Crossing.  According to Gilley, McGregor agreed.

McGregor made overtures to Senator Barry Mask.  In a February 15, 2010, phone call, McGregor emphasized the importance of Mask's vote on SB380 and then promised him "significant help."  Ex. J-004, page 17, line 19. McGregor assured Mask that the promise of financial help was "as good as ... any commitment you will ever get" and said he could "prove" the commitment.  Id. at page 18,

25

lines 3-9.  The next day he directed a $ 5,000 PAC contribution to Mask.  The most reasonable interpretation of McGregor's conduct is that he intended the $ 5,000 contribution to be a down payment on a promise of much greater support if Mask voted for the gambling legislation.

Furthermore, McGregor was present during a private meeting with Senator Beason on February 18, 2010.  At the meeting, Gilley and Massey explicitly communicated to Beason they would provide support in exchange for his vote on SB380.  "Although not controlling, presence and association are material and probative factors" when evaluating a defendant's knowing participation in a conspiracy.  United States v. Lluesma, 45 F.3d 408, 410 (11th Cir. 1995).  In connection with Gilley's testimony and circumstantial evidence, the government has met its burden to show that McGregor was involved in the conspiracy to buy votes.  Indeed, McGregor served as the

conspiracy's director in terms of financing, strategy, and core objectives.

### B.  Gilley's Lobbyists and Aides

To support the effort to buy "yes" votes for SB380, Gilley employed the services of Jarrod Massey and Jennifer Pouncy.  Both Massey and Pouncy have pled guilty to conspiracy to commit federal programs bribery.  They knowingly participated in the conspiracy, making numerous bribes to lawmakers on Gilley's behalf.  At Gilley's direction, they conspired with Smith, Preuitt, Means, and Ross to enter bribery agreements exchanging campaign contributions for their votes on SB380.

Gilley was also supported by Walker, the spokesperson for Country Crossing.  Walker knew of the conspiracy's illegal objective and sought to take an active role, offering his campaign and polling services in exchange for a "yes" vote on SB380.

The government, therefore, has satisfied the preponderance-of-the-evidence standard to admit Massey's, Pouncy's, and Walker's against other co-conspirators.

### C.   Lawmakers

The preponderance of the evidence indicates that Smith took an early role in the conspiracy.  In 2008, Smith entered into a partnership with Gilley in exchange for $ 40,000 in campaign contributions surreptitiously funneled through Massey.  According to Gilley, Smith told him upon receiving the money: "I'm yours. Whatever you need, you just let me know."  Trial Transcript, Doc. No. 1334, at 44.  Between 2008 and 2010, Smith received over $ 600,000 in contributions from Gilley.

After forming this alliance, Smith supported gambling legislation that would benefit Gilley's business interests.  She was aware of the conspiracy's illegal objective.  Indeed, she participated in Gilley's admitted

attempts to bribe Beason and Lewis for their votes on SB380.  In February, Smith tipped off Gilley and McGregor that it was the perfect opportunity to buy Beason's vote because he had lost some of his prior financial support. In addition, Smith joined in meetings where Massey attempted to bribe Preuitt with campaign contributions. She also made explicit offers to secure campaign contributions for former Senator Steve French in exchange for his vote on SB380.

Of course, it is not a crime for lawmakers to lobby one another on the merits of a bill.  But in this case, the government has shown by a preponderance of the evidence that money motivated Smith more than the merits of any piece of legislation.  Smith was willing to sell not simply her vote but her office to the interests that financed her campaign.

The government has satisfied its evidentiary burden that Preuitt knowingly joined the conspiracy when he agreed to sell his vote for SB380 after a concerted

effort by Gilley, Massey, Pouncy, and Walker to bribe
him.   At the beginning of March 2010, Preuitt voted
against SB380 in a procedural vote that blocked the bill
from reaching a substantive vote in the Alabama Senate.
In a tapped phone call, Gilley said he was committed to
changing Preuitt's "no" vote into a "yes" vote.  Over the
month of March, Massey, Pouncy, and Walker made a series
of explicit promises to Preuitt to persuade him to vote
in favor of SB380; these promises included $ 2,000,000 in
campaign contributions, support from country music
singers, and a poll to be conducted by Walker.

The evidence demonstrates that Preuitt agreed to
switch his vote on SB380 in exchange for the promises he
was offered.  Preuitt coordinated with Means to hold out
for as large a bribe offer as possible.  In a meeting
with Preuitt, Massey reiterated the offers he had placed
on the table in exchange for a "yes" vote on SB380.
Preuitt responded by winking and saying: "as you know
I've gone, come a long way."  Ex. J-78, page 4, lines 42-

43.  On March 30, 2010, Preuitt voted in favor of SB380. When Gilley thanked Preuitt for his vote the following day, Preuitt immediately reminded him of the contributions he had been promised.

Preuitt's conduct serves as an example of a bribery compact reached through a knowing wink.  Though there is no evidence of express consent by Preuitt, no such evidence is required if the mutual understanding between the parties is clear.  A bribery agreement involving campaign contributions "must be explicit, but there is no requirement that it be express. To hold otherwise...would allow defendants to escape criminal liability through 'knowing winks and nods.'" Siegelman, 640 F.3d at 1171 (quoting Evans v. United States, 504 U.S. 255, 274 (1992) (Kennedy, J., concurring)).  Preuitt's acceptance of the bribe is unambiguous, as is his voluntarily participation in the conspiracy.

The government has similarly shown by a preponderance of the evidence that Means knowingly participated in the

conspiracy by agreeing to sell his vote. Specifically, Means worked in tandem with Preuitt to secure large campaign contributions in exchange for "yes" votes on SB380. They both knew the importance of their votes to passing the bill and sought the best deals possible. Means told McGregor at one point that he and Preuitt were "trying to stay together" on the gambling legislation. Ex. J-146, page 16, lines 28-29. Circumstantial evidence confirms this relationship. In a phone call, Pouncy told Preuitt that commitments made to him would be kept whether or not SB380 passed. Shortly thereafter, Means called Pouncy and requested a $ 100,000 contribution.

Means indicated that he would need $ 100,000 in funding because he would have less support from his constituency if he voted for SB380. When Pouncy called to verify the commitment the next day, Means asked her: "Are we talking about the same thing?" Trial Transcript, Doc. No. 1810, at 196. This indicates that Means knew that the $ 100,000 contribution was not an unconditional

contribution but rather in exchange for a specific official act, the vote for SB380 he had discussed the prior day.

The government has established by a preponderance of the evidence that Ross knowingly participated in the conspiracy when he sought to extort campaign contributions to ensure his vote for SB380. Ross differed from some other lawmakers in the scheme because he had an established history of supporting pro-gambling legislation. Nevertheless, he knew that his vote was essential to the bill's success.

During late 2009 and early 2010, Ross solicited contributions from Massey and Pouncy. He implied that he was "not feeling the love" given his record of support for pro-gambling legislation during the 2009 legislative session. Trial Transcript, Doc. No. 1810, at 150. Though it is not illegal for a lawmaker to actively solicit contributions from past supporters, the evidence demonstrates that Ross was explicitly conditioning his

votes in favor of pro-gambling legislation on campaign contributions. As the vote on SB380 approached, Ross sought to leverage his position while he could. After receiving smaller contributions of $ 5,000 from Massey, Ross began to demand increasingly large sums.

Ross also sought contributions from Coker and McGregor directly before the vote on SB380. On March 29, 2010, Ross asked McGregor: you "feel like you got the twenty-one [votes] in the Senate?" Ex. J-159, page 5, lines 35-36. After McGregor responded that he was "cautiously optimistic," id. at page 5, line 38, Ross solicited campaign contributions later in the conversation. On March 30, 2010, the day of the vote on SB380, Ross again solicited contributions. He told McGregor that: "we're just getting down to the wire," ex. J-161, page 5, lines 14-15, and "we know the window is closing on us fast." Id. at page 5, lines 43-44. McGregor agreed to help however he could.

34

Thus, the government has demonstrated by a preponderance of the evidence that Smith's, Preuitt's, Means's, and Ross's statements were admissible against other co-conspirators.

### D. McGregor's lobbyists

In addition to Gilley's, Massey's, and Pouncy's efforts, McGregor directed the conspiracy with the assistance of his two lobbyists Coker and Geddie. Both men were involved in McGregor's efforts to promote SB380 and to provide campaign contributions to lawmakers in the Alabama legislature. It is possible for lobbyists to conduct these tasks legally.

But here, the government has established by a preponderance of the evidence that Coker's and Geddie's actions crossed the line into illicit bribery. In a wiretapped call, McGregor said he planned to assign Coker and Geddie to work on securing SB380 votes. Both

35

lobbyists were aware of the conspiracy's illegal objective and voluntarily joined in.

The evidence indicates that Coker knew of and supported the bribe offers made to Preuitt by Gilley and his associates.  During the same period that Gilley, Massey, and Pouncy were bribing Preuitt for his vote, Coker was actively lobbying Preuitt and Means for their support on SB380.  McGregor told Coker that they needed to "zero in on Preuitt ... like a laser beam."  Ex. J-147, page 12, lines 37-38.  After Coker met with Preuitt to shore up his vote, Coker suggested that McGregor thank Gilley for "sorta puttin' a little icin' on the cake."  Ex. J-150, page 7, lines 24-25.  In a subsequent meeting, Preuitt asked Coker to specify what Gilley was offering when he had promised to be "heavily involved" in Preuitt's campaign.  Ex. J-082, page 2, line 31.  The totality of direct and circumstantial evidence indicates that both Coker and McGregor knew of and actively supported the effort to buy Preuitt's vote.

Indeed, the government showed by a preponderance of the evidence that Coker was using McGregor's funds directly in an effort to bribe Preuitt and Means.   On March 29, 2010, two days before the vote on SB380, Coker assured McGregor that Means and Preuitt's votes for the bill were secure.   Coker explained they could feel confidant because "I'm spending a lot of ya money."   Ex. J-160, page 5, line 26.   McGregor responded: "Well you, you delivering the cheese.   Ain't ya man?"   Id. at page 5, lines 29-30.   By explicitly linking McGregor's money with the senators' votes, Coker demonstrated that he was knowingly using campaign contributions as illicit bribes.

While there is no direct evidence that Geddie bribed lawmakers personally, the government satisfied the preponderance-of-the-evidence standard that Geddie knew the illegal objective of the conspiracy and voluntarily participated in it.   For instance, Geddie was aware of the effort to bribe Beason.   In spite of the February 18 offer of $ 1,000,000 per year, Beason had opposed SB380

in a procedural vote on March 3.  When McGregor and
Geddie later discussed the possibility of approaching
Beason again for his vote, Geddie opposed this plan,
replying that "we've been down that road before."  Ex. J-
140, page 3, lines 12-13.  This statement indicates that
Geddie was likely aware of the bribery tactics being used
to secure Beason's vote.

Similarly, after SB380 passed the Alabama Senate,
Geddie sought a commitment from Representative Grimes
that he would vote for the House version of the bill.
Geddie planned to tell Grimes that any future campaign
support from McGregor would be conditioned on his vote:
"I'm just gonna let [Grimes] know that ... we either
gonna to be in or out of his race. ... So far we've been
in, but we're getting ready to get out."  Ex. J-169, page
3, lines 25-32.

The government also showed by a preponderance of the
evidence that Geddie took steps to support McGregor's
overtures to Representative Mask.  At McGregor's

direction, Geddie brought Mask a $ 5,000 PAC contribution as proof of McGregor's promise in exchange for Mask's vote. Geddie knew these payments were part of an illicit scheme. During a March 23, 2010 phone conversation corroborates his knowledge of the scheme. Before discussing progress on SB380, McGregor asked Geddie if he had called on a "safe phone." Ex. J-151, page 3, lines 12-13. Geddie laughed in response, "I hope so. If I'm not, I'm in trouble." Id. at page 3, lines 15-16.

For the foregoing reasons, the court finds by a preponderance of the evidence that McGregor, Coker, Geddie, Means, Preuitt, Ross, Smith, and Walker participated in one conspiracy to commit federal programs bribery as described in the indictment. Each of the hearsay statements provisionally admitted into evidence against the defendants was during the course of and in furtherance of the conspiracy. See United States v. Skidmore, 254 F.3d 635, 638 (7th Cir. 2001) ("In examining what constitutes a statement in furtherance of

a conspiracy, we have explained that a wide range of statements qualify, includ[ing] comments ... to inform other members about the progress of the conspiracy [and] to control damage to or detection of the conspiracy...") (quoting <u>United States v. Johnson</u>, 200 F.3d 529, 532 (7th Cir.2000)).[7]

## V.

The government has also introduced co-conspirator statements by individuals who were not identified in the indictment. As with the six defendants discussed above, the court finds by a preponderance of the evidence that these statements are admissible under Federal Rule of Evidence 801(d)(2)(E).

---

7. The court recognizes that it has before it several outstanding motions to reconsider the adequacy of the evidence and to reconsider certain legal rulings. This opinion only expounds upon the court's oral findings regarding the admissibility of co-conspirator statements under the Federal Rules of Evidence. This opinion does not address other arguments raised by the defendants.

The government offered an e-mail by Rick Heartsill with a list of names and addresses of PACs that had contributed to Smith.  The statement was in furtherance of the conspiracy because Gilley admitted he had relied on these PAC contacts to transfer illicit campaign contributions to Smith.

The jury also heard calls between Senator Bedford and McGregor.   The evidence establishes under the preponderance-of-the-evidence standard that Bedford was a member of the conspiracy.  He urged McGregor to get votes to pass SB380 and he discussed offering Preuitt a committee appointment in return for his vote.   His statements were in furtherance of the conspiracy in that they assisted McGregor in counting "yes" votes on SB380 and determining which lawmakers to lobby.

Taped conversations between Joe Perkins and McGregor were admitted into evidence.   Perkins worked with McGregor and Gilley to ensure "yes" votes from other senators.  The evidence indicates that Perkins was aware

41

of Gilley's offers to lawmakers and knowingly participated in the plan.   These statements were in furtherance of the conspiracy because they helped inform McGregor of progress on securing votes for SB380.

The government also offered recordings between Monica Cooper and McGregor.   Monica Cooper was an employee of the Republican Senatorial Caucus whom McGregor paid $ 4,000 per month.   The government demonstrated by the preponderance of the evidence that Cooper gave McGregor inside information about Senate discussions of SB380. McGregor asked Cooper give him reports of senators' positions on pro-gambling legislation and Cooper provided information about which senators' votes were still undecided.   These statements furthered the conspiracy by updating McGregor on progress toward the goal.

VI.

The government has failed to establish by a preponderance of the evidence that Crosby was a member of

42

the conspiracy.  While the evidence demonstrates that Crosby received monthly payments of $ 3,000 from McGregor during 2009 and 2010 and that these payments may have been in connection with the drafting of gambling legislation, the evidence does not sustain the conclusion that Crosby had knowledge of or voluntarily joined the broad conspiracy alleged in the indictment. (Indeed, while the applicable burden is different, the court dismissed the conspiracy count against Crosby on sufficiency-of-the-evidence grounds.)

* * *

For the above reasons, the court finds that the hearsay statements of the conspirators were and are admissible against McGregor, Coker, Means, Preuitt, Smith, and Walker, but not against Crosby.  However, the court again emphasizes that, because these finding of fact are based not on the beyond-a-reasonable-doubt standard but rather on the less-demanding preponderance-of-the-evidence standard, this opinion should not be

43

construed as finding that these six defendants are guilty beyond a reasonable doubt.  That determination is within the province of the jury and is not for the court to decide.  Indeed, if the applicable standard here were beyond a reasonable doubt, the court might very well reach  contrary findings in this opinion insofar as these six defendants' participation in the alleged conspiracy is discussed.

DONE, this the 20th day of October, 2011.

        /s/ Myron H. Thompson    
    UNITED STATES DISTRICT JUDGE